IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 13-cv-02975-PAB-KLM

NORMAN L. PERNICK as Chapter 11 Trustee of the Bankruptcy Estate of Industrial
Enterprises of America, Inc., on behalf of itself, the estate and as assignee of its
shareholders,

       Plaintiff,

v.

COMPUTERSHARE TRUST COMPANY, INC.,

       Defendant.

---

## ORDER

---

    This matter is before the Court on the Motion to Dismiss the Complaint Pursuant
to Fed. R. Civ. P. 12(b)(6) [Docket No. 56] filed by defendant Computershare Trust
Company, Inc. ("Computershare").[1]  The motion raises the issues of whether a transfer
agent has a duty to investigate the validity of an issuance of stock and whether the
indemnification clause in the contract between the transfer agent and the company is
enforceable.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

---

[1]Although Computershare states that, in 2007, Computershare Trust Company,
Inc. was merged into Computershare Trust Company, N.A., Docket No. 17, neither
party has filed a motion to amend the caption.

## I. BACKGROUND[2]

Advanced Bio/Chem, Inc. was established in 2004 and later changed its name to Industrial Enterprises of America, Inc. ("IEAM").[3]   Docket No. 1 at 7, ¶ 23.   IEAM was a publicly traded shell company.  *Id.*  Computershare provides transfer agent services for securities to public corporations and closed-end funds.  *Id.* at 5, ¶ 19.  Computershare acted as the transfer agent for IEAM's securities at all times relevant.  *Id.*

When it was established in 2004, IEAM's lone asset was 15 million shares of

---

[2]The following facts are taken, in part, from the allegations in plaintiff's complaint. The factual allegations in plaintiff's complaint are presumed true unless, as noted herein, they are conclusory or contradicted by other, more specific allegations.  *See Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012) ("conclusory and formulaic recitations" of the elements "are insufficient to survive a motion to dismiss"); *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 152 (2d Cir. 2014) (holding that "general allegations that are contradicted by more specific allegations in the Complaint" need not be accepted as true (quotation omitted)).

To the extent the following facts are taken from sources outside plaintiff's complaint, when considering a motion to dismiss, a court typically disregards facts supported by documents other than the complaint unless it first converts the motion to dismiss into a motion for summary judgment.  *Jackson v. Integra Inc.*, 952 F.2d 1260, 1261 (10th Cir. 1991).  However, a court may consider documents outside of the complaint on a motion to dismiss in certain instances.  Of relevance here is the exception permitting a court to consider documents that are both central to a plaintiff's claims and to which a plaintiff refers in his complaint.  *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997), as well as documents subject to judicial notice, including court documents and matters of public record.  *Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006); *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) ("It [is] recognized that a court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." (quotation omitted)).  The Court has examined the documents submitted by the parties that are attached to or referenced in the complaint and court filings implicitly or explicitly referred to by the parties and has determined that each of the documents cited in this opinion may appropriately be referenced by the Court without converting the present motion into a motion for summary judgment.

[3]For consistency, the Court will refer to this entity as "IEAM."

restricted stock in Power3 Medical Products ("Power3"), which shares were valued at $45 million.  *Id.* at 7, ¶ 23.  On August 1, 2004, John Mazzuto was appointed a director of IEAM.  *Id.*  On October 7, 2004, IEAM purchased all outstanding stock in EMC Packaging, Inc. ("EMC") by paying EMC's shareholders 2.2 million shares of IEAM stock.  *Id.* at 7, ¶ 24.  On October 15, 2004, Mr. Mazzuto was appointed vice chairman of IEAM's board of directors and, on December 15, 2005, Mr. Mazzuto was elected CEO and president of IEAM.  *Id.* at 7, ¶ 25.  James Margulies was IEAM's CFO and general counsel.  Docket No. 1-5 at 2.

On November 1, 2003, IEAM and Computershare executed the Stock Transfer Agency Agreement (the "Agreement") [Docket No. 1-2].  Pursuant to the Agreement, Computershare was required to provide transfer agent services to IEAM, Docket No. 1-2 at 3, 18-19, and Computershare received $7,800 per year from IEAM for its services.  *Id.* at 20.[4]  The Agreement provides that Computershare shall transfer shares "upon the presentation to Computershare of stock transfer instructions properly endorsed if Shares are in uncertificated form.  Such . . . transfer instructions shall be accompanied by such documents as are reasonably necessary to evidence the authority of the person making the transfer . . . ."  Docket No. 1-2 at 5.  With respect to the transfer of restricted shares, the Agreement allows Computershare to request a legal opinion from IEAM's counsel and further states that "Computershare assumes no responsibility with respect to the transfer of restricted securities in accordance with such opinion."  *Id.* at 6.

---

[4]To the extent plaintiff's complaint suggests that Computershare earned commissions for each stock issuance it facilitated, Docket No. 1 at 22, ¶ 94, such a suggestion is contradicted by the Agreement's fee schedule.  *See* Docket No. 1-2 at 20-21.

The Agreement states that "Computershare may refuse to transfer Shares until it is satisfied that the requested transfer is legally authorized." *Id.*

Article 5 of the Agreement contains a provision limiting Computershare's liability (the "exculpatory clause"):

> 1.  The Company agrees that Computershare shall not be liable for any action taken or omitted to be taken in connection with this Agreement, except that Computershare shall be liable for direct losses incurred by the Company arising out of Computershare's gross negligence or willful misconduct.  Any liability of Computershare shall be limited to the amount of fees paid by the Company to Computershare in the preceding twelve (12) months for the Services, it being understood that the Services could not be provided to the Company by Computershare at the prices set forth herein without the foregoing liability limitation.  Under no circumstances shall Computershare be liable for any special, indirect, incidental, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, lost profits), even if Computershare has been advised of the possibility of such loss or damage . . . .
>
> 2.  Notwithstanding anything to the contrary, Computershare shall not be liable in connection with
>
> a) The legality of the issue, sale or transfer of any Shares, the sufficiency of the amount to be received in connection therewith, or the authority of the Company to request such issuance, sale or transfer;
>
> b) The legality of the purchase of any Shares, the sufficiency of the amount to be paid in connection therewith, or the authority of the Company to request such purchase; . . .
>
> e) Acting upon any oral instruction, writing or document reasonably believed by Computershare to be genuine and to have been given, signed or made by an Officer . . . .

*Id.* at 7-8.  Article 7 of the Agreement states that IEAM agrees to defend, indemnify, and hold harmless Computershare from any loss or damage incurred by Computershare or relating to Computershare's provision of services; "provided, however, that no Indemnified Party shall have the right to be indemnified hereunder for

4

any liability to the extent finally determined by a court of competent jurisdiction that such Losses have resulted directly from the gross negligence or willful misconduct of such Indemnified Party." *Id.* at 10.  The Agreement states that Colorado law governs the agreement.  *Id.* at 14.

Plaintiff alleges that Computershare owed IEAM various extra-contractual duties. Plaintiff alleges that Computershare owed IEAM a duty to act in accordance with the Securities Transfer Association, Inc. ("STA")[5] guidelines (the "STA guidelines").  Docket No. 1 at 10, ¶ 37.  The STA approved the STA guidelines, intending that they be "implemented uniformly, with the result that most variations in transfer requirements will be eliminated." *Id.* at 11, ¶ 38.  Plaintiff also alleges that Computershare owed IEAM a duty to act in accordance with various provisions of Article 8 of the Uniform Commercial Code.  *Id.* at 14, ¶ 47.

In November 2004, IEAM issued its 2004 Stock Option Plan (the "Plan") and, on January 25, 2005, IEAM filed a form S-8 registration statement for the Plan with the United States Securities and Exchange Commission ("SEC").[6]   Docket No. 1 at 8, ¶¶ 27-28.  The Plan permitted IEAM to issue a maximum of 15 million restricted shares

---

[5]Plaintiff's complaint does not explain what the STA is, but his allegations suggest that the STA may be an industry trade group. *See* Docket No. 1 at 10, ¶ 37.

[6]An S-8 registration statement is filed with the SEC to register "[s]ecurities of the registrant to be offered under any employee benefit plan to its employees or employees of its subsidiaries or parents." *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1273 n.11 (11th Cir. 2012) (quotation omitted).  This includes securities offered to officers, consultants, or advisors who are natural persons who provide bona fide services to the registrant.  United States Securities & Exchange Commission, Form S-8: Registration Statement Under the Securities Act of 1933, *available at* https://www.sec.gov/about/forms/forms-8.pdf (last visited August 14, 2015).

to employees, outside directors, or bona fide consultants.  *Id.* at 8, ¶ 29.

There is some dispute as to whether IEAM provided the Plan to Computershare.

Plaintiff's complaint does not explicitly allege that IEAM provided the Plan to

Computershare.  However, the complaint suggests that the Plan was filed with the SEC

and was therefore publicly available.  *See id.* at 10, ¶ 36 (stating that the Agreement

obligated Computershare to "confirm the authority of the people directing the stock

issuances and check the requirements of the Plan given to them (and filed with the

SEC), and empowered it to require a legal opinion when concerned about impropriety");

*see also* Docket No. 56 at 14 (stating that the Plan was filed with the SEC on January

25, 2005).

Beginning in January 2005, Mr. Mazzuto and Mr. Margulies directed

Computershare to issue unrestricted plan shares of IEAM stock to ineligible recipients.

Docket No. 1 at 8, ¶ 30.  The typical process for issuing these shares was as follows:

Mr. Mazzuto or Mr. Margulies would send a signed letter (collectively, the "issuance

letters") to Computershare directing it to issue a certain number of IEAM shares to a

particular recipient.  *See generally* Docket No. 1-6.  Many of the letters referred to the

Plan and/or the S-8 registration statement.  *See, e.g.*, *id.* at 4 ("Please issue Twenty

Thousand (20,000) shares of [IEAM] common stock pursuant to our [IEAM] 2004 Stock

Option Plan.  These shares should be issued free trading via electronic transfer

pursuant to the following instructions pursuant to the previously provided S-8

registration statement dated January 24, 2005").  These letters would sometimes be

accompanied by fabricated minutes from an IEAM board meeting.  Docket No. 1 at 8, ¶

31.  Computershare would then issue the shares to the recipient named in the issuance

6

letters (the "recipient").  *Id.*  Most recipients sold the shares on the open market.  *Id.* at 9, ¶ 32.  Using this process, Mr. Mazzuto and Mr. Margulies caused the issuance of approximately 43 million shares of unrestricted IEAM stock between January 24, 2005 and January 16, 2008.  *Id.* at 9, ¶ 31.  On or about September 7, 2005, share issuances exceeded the Plan's 15 million limit on restricted shares.  *Id.*

Plaintiff alleges that Computershare issued shares regardless of whether board minutes, counsel opinion, or other confirmation was attached to the issuance letters, which was in violation of the Agreement and Computershare's "extra-contractual duties."  *Id.* at 8-9, ¶ 31.  Plaintiff alleges that Computershare issued unrestricted, free-trading stock, which was contrary to the terms of the Plan, and that 70% of the recipients were ineligible to receive such shares under the Plan, either because they were entities or natural persons who did no bona fide work for IEAM.  *Id.*  Plaintiff asserts that IEAM relied on Computershare's expertise as a transfer agent to ensure that the stock issuances were proper pursuant to the Plan.  *Id.* at 17, ¶ 60.

Plaintiff alleges that Mr. Mazzuto and Mr. Margulies caused IEAM shares to be issued pursuant to an illegal scheme (the "Mazzuto scheme") aimed at manipulating IEAM's stock price in order to profit from the illegal transfer and sale of IEAM stock.  *Id.* at 3-4, ¶¶ 11-13.  Plaintiff contends that, through Computershare's participation, the Plan was "illegally converted into the means by which **un**restricted stock was illicitly issued to, sold by, and/or sold for the benefit of members of the Mazzuto Scheme."  *Id.* at 4, ¶ 14 (emphasis in original).  Plaintiff alleges that Computershare was rewarded for its participation in the scheme through fees, commissions, and incidental fees.  *Id.* at 4-

5, ¶ 16.  During Mr. Mazzuto's time as CEO, approximately 133 million shares of IEAM stock were traded with a total market value of $450 million.  *Id.* at 17, ¶ 62.  By April 30, 2009, the market value of the 133 million shares traded during Mr. Mazzuto's tenure as CEO was $0.  *Id.*

During Mr. Mazzuto's and Mr. Margulies' tenure with IEAM, Jerome Davis and Michael Solomon served on IEAM's board of directors.  *Id.* at 17, ¶ 63.  Mr. Davis testified at Mr. Margulies' criminal trial that he was unaware of Mr. Mazzuto's and Mr. Margulies' scheme to issue IEAM shares and believed that both individuals took steps to prevent Mr. Davis from discovering any irregularities.  *Id.* at 17, ¶ 64.  Robert Renck, Jr. took over as IEAM's president and CEO and remained in those roles until May 2013.  *Id.* at 17-18, ¶ 65.

On November 14, 2007, an IEAM shareholder brought a class action against IEAM, Mr. Mazzuto, Mr. Margulies, and other IEAM executives (the "class action") in the United States District Court for the Southern District of New York, *Mallozzi v. Industrial Enterprises of America, Inc.*, No. 07-cv-10321 (S.D.N.Y.) (Docket No. 1).  The class action complaint alleged that IEAM shareholders suffered damages as a result of Mr. Mazzuto's and Mr. Margulies' actions in issuing IEAM shares.  Docket No. 1 at 18, ¶ 66.  The named plaintiffs' second amended complaint asserted claims for violation of § 10(b) and § 20(a) of the Securities and Exchange Act.  *Mallozzi*, (Docket No. 120 at 37-41.

On May 1, 2009, IEAM filed a voluntary Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Delaware (the "Delaware bankruptcy

court").  Docket No. 1 at 1, ¶ 1; *see also In re Indus. Enters. of Am.*, No. 09-11508-BLS (Bankr. D. Del. May 1, 2009) (Docket No. 1).  On May 11, 2009, the Delaware bankruptcy court issued an order authorizing the joint administration of IEAM's bankruptcy case with other related cases.  *In re Pitt Penn Holding Co., Inc.*, No. 09-11475-BLS (Bankr. D. Del. May 11, 2009) (Docket No. 21).

On July 7, 2009, the Delaware bankruptcy court granted the named plaintiffs in the class action relief from the automatic stay for purposes of consummating a settlement.  *Mallozzi*, Docket No. 109 at 1-2.  On December 12, 2010, IEAM and class members agreed to a settlement (the "class action settlement").  Docket No. 1 at 18, ¶ 67.  On June 1, 2011, the court in the class action issued an order approving the class action settlement.  *Mallozzi*, (Docket No. 134).  Pursuant to Fed. R. Civ. P. 23, the court certified the class as "all persons who purchased or otherwise acquired any common stock of IEAM during the period from December 4, 2006 through and including November 7, 2007, and were damaged thereby."  *Id.* (Docket No. 134 at 3).[7]  Plaintiff alleges that, by virtue of the class action settlement, "IEAM received an assignment of all claims belonging to individual class members against all third-parties," which includes "any claims against Defendant for the claims alleged herein."  Docket No. 1 at 18, ¶¶ 68-69; *see also Mallozzi*, (Docket No. 127-1 at 21) ("the Lead Plaintiffs and all Class members hereby assign to IEAM any and all claims not released by this settlement that they have or may have against persons other than Defendants which arose out of or relate to the issuance or transfer of IEAM stock, assets or property").

---

[7]The Court refers to individual IEAM shareholders who were subject to the class action settlement as "class members."

On April 30, 2011, IEAM filed an adversary proceeding (the "Delaware adversary proceeding") against Computershare and three other defendants in the Delaware bankruptcy court.  Docket No. 1 at 1, ¶ 2; *Indus. Enters. of Am. v. Computershare Trust Co., Inc.* ("*IEAM*"), No. 11-51877-BLS (Bankr. D. Del. April 30, 2011) (Docket No. 1). On January 20, 2012, IEAM filed an amended complaint in the Delaware adversary proceeding.  *IEAM*, (Docket No. 60).

In May 2013, the Delaware bankruptcy court appointed plaintiff Norman Pernick as the Chapter 11 Trustee of IEAM.  Docket No. 1 at 2, ¶ 5.  On August 2, 2013, the Delaware bankruptcy court dismissed IEAM's claims against Computershare in the Delaware adversary proceeding pursuant to the Agreement's forum selection clause. *Id.* at 1-2, ¶ 3.  Computershare agreed to waive any statute of limitations arguments it could not have raised in the adversary proceeding, provided IEAM filed its complaint in Colorado within 90 days of the Delaware bankruptcy court's order dismissing the adversary proceeding.  *Id.*[8]

---

[8]Citing the Delaware bankruptcy court's order dismissing IEAM's claims against Computershare, plaintiff's complaint alleges that the Delaware bankruptcy court held that the doctrine of equitable tolling tolled the applicable statutes of limitations as to IEAM's causes of action against Computershare.  Docket No. 1 at 1-2, ¶ 3 (citing *IEAM*,(Docket No. 82 at 7, ¶ 13)).  Plaintiff's characterization of the Delaware bankruptcy court's order is not entitled to the presumption of truth and, moreover, is inaccurate.  *See Toone v. Wells Fargo Bank, N.A.,* 716 F.3d 516, 521 (10th Cir. 2013) (holding that, when document referenced in complaint is properly considered, "we examine the document itself, rather than the complaint's description of it").  The cited portion of the bankruptcy court's order does not, strictly speaking, discuss IEAM's claims against Computershare, which it had already dismissed pursuant to the forum selection clause.  *IEAM*, (Docket No. 82 at 5, ¶ 9, *id.* at 7, ¶ 13).  Moreover, even if the Delaware bankruptcy court intended to apply equitable tolling to IEAM's claims against Computershare, the court's order stated that the doctrine of equitable tolling applied in *IEAM*, No. 11-51877-BLS, in the same manner the court applied the doctrine in related case, *In re Pitt Penn Holding Co.*, No. 11-51880-BLS (Bankr. D. Del.).  *Id.* (Docket No.

Based upon his conduct related to IEAM stock, Mr. Mazzuto was charged in New York state court with, among other things, grand larceny, scheme to defraud, scheme to defraud through securities fraud, falsifying business records, conspiracy, and securities fraud.  Docket No. 1 at 5-6, ¶ 20.  Mr. Mazzuto pled guilty and was sentenced to prison. *Id*.  Mr. Mazzuto testified that, as a result of such conduct, he received $10.5 million. *Id*.  Based upon his conduct related to IEAM stock, Mr. Margulies was charged with grand larceny, scheme to defraud, scheme to defraud through securities fraud, falsifying business records, and conspiracy.  *Id*. at 6-7, ¶ 21.  Mr. Margulies was found guilty of those charges at trial and was sentenced to prison.  *Id*.  At trial, the evidence established that Mr. Margulies was issued 717,500 unrestricted shares of IEAM stock, which he immediately sold on the open market.  *Id*.  Mr. Margulies received more than $5 million as a result of his and Mr. Mazzuto's conduct related to IEAM stock.  *Id*.

On October 30, 2013, plaintiff filed the present case on behalf of IEAM and as an assignee of certain of IEAM's shareholders.  Docket No. 1 at 1.  Plaintiff asserts Colorado-law claims against Computershare for fraud, professional negligence, negligence, constructive fraud/unjust enrichment, and breach of contract (in the alternative).  *Id*. at 18-22.  Plaintiff asserts claims under 11 U.S.C. §§ 544, 548, 550 and Colo. Rev. Stat. §§ 38-8-105, 38-8-106 for recovery of fees IEAM paid to Computershare, *id*. at 23-27.  Plaintiff seeks, among other things, restitution from

---

82 at 7, ¶ 13 n.17).  In the related case, the Delaware bankruptcy court assumed that equitable tolling applied to toll the accrual of IEAM's state law claims "until the petition date."  *In re Pitt Penn Holding Co.*, 484 B.R. 25, 43-44 (Bankr. D. Del. 2012).  Thus, there is no suggestion that the Delaware bankruptcy court applied equitable tolling to toll the statute of limitations beyond May 1, 2009, when IEAM filed its Chapter 11 petition.

Computershare for the full value of the improperly issued shares.  *Id.*

## II.  STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and alteration marks omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim.  *Khalik*, 671 F.3d at 1191 (quotations omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (alteration marks omitted).

## III.  ANALYSIS

### A.  Class Members' Claims

It is unclear to what extent plaintiff asserts his claims for relief on behalf of class

member IEAM shareholders.  The class members assigned to IEAM any claims they

possessed arising out of or relating to the transfer of IEAM stock, assets, or property,

*Mallozzi*, (Docket No. 127-1 at 21), which confers upon IEAM the right to bring whatever

claims class members have relating to the transfer of IEAM stock, assets, or property.

The question therefore becomes what claims IEAM can bring on behalf of the class

members or, in other words, what claims the class members have against

Computershare.  The complaint does not identify what assigned claims are asserted on

behalf of the class members or articulate a theory by which Computershare is liable to

the class members.  Rather, plaintiff alleges only that he brings this case "on behalf of

IEAM and as an assignee of IEAM's shareholders."  Docket No. 1 at 1.

Computershare argues that, because IEAM shareholders were not party to the

Agreement and because plaintiff has failed to plead that Computershare owed a duty in

tort to IEAM shareholders, plaintiff has failed to state any claims against

Computershare on behalf of the class members.  Docket No. 56 at 8, 12.

Computershare argues, in the alternative, that whatever claims plaintiff asserts on

behalf of the class members are derivative in nature.  Docket No. 61 at 9.  Plaintiff does

not dispute that he cannot assert a claim for breach of contract on behalf of the class

members, but argues that the Uniform Commercial Code ("UCC") as adopted in

Colorado placed upon Computershare certain duties to IEAM shareholders.  Docket

No. 60 at 8-9.  Plaintiff's argument does not, however, address the relevant threshold

question, namely, whether the class members have standing to bring claims against

Computershare.

There are two types of shareholder actions.  Derivative actions are those

13

"brought by a shareholder on behalf of the corporation to recover for harm done to the

corporation." *Cohen v. Mirage Resorts, Inc.*, 62 P.3d 720, 732 (Nev. 2003) (citing

*Kramer v. W. Pac. Indus.*, 546 A.2d 348, 351 (Del. 1988)); *see also Kamen v. Kemper*

*Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991) ("The derivative form of action permits an

individual shareholder to bring suit to enforce a *corporate* cause of action against

officers, directors, and third parties.")[9]   Shareholders may also bring direct actions

against third parties for "injuries done to them in their individual capacities." *Kramer*,

546 A.2d at 351 (emphasis and quotations omitted).  "Whether a cause of action is

---

[9]Neither party addresses choice of law with respect to claims asserted on behalf of the class members.  Computershare asserts, and plaintiff does not dispute, that the class members were not parties to or third party beneficiaries of the Agreement. Docket No. 56 at 8.  Thus, the Agreement's choice of law provision would not appear to apply to claims asserted on behalf of class members.  Corporations are generally governed by the laws of the state under which they are organized, *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 90 (1987), which, in this case, suggests that the class members' claims should be evaluated under Nevada law.  *See Oteng v. Golden Star Resources, Ltd.*, 615 F. Supp. 2d 1228, 1237-38 (D. Colo. 2009) (applying Ghana law to determine whether plaintiffs could bring shareholder derivative suit on behalf of Ghanaian corporation).  In a diversity action, a federal court applies the choice of law rules of the state in which it sits.  *Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1532 (10th Cir. 1996).  Colorado courts apply the "most significant relationship" test to resolve conflict of law issues.  *AE, Inc. v. Goodyear Tire & Rubber Co.*, 168 P.3d 507, 508 (Colo. 2007).  Colorado courts may also apply the "'internal affairs' doctrine, which provides that the right[s] of a shareholder in a foreign company (including the right to sue derivatively) are determined by the law of the place where the company is incorporated."  *Oteng*, 615 F. Supp. 2d at 1238.  The parties assume that Colorado law applies to all claims asserted in this case.  Pursuant to the internal affairs doctrine, the fact that IEAM is incorporated under the laws of Nevada suggests that the class members' claims should be evaluated under Nevada law.  The Court, however, need not decide whether the class members' claims should be evaluated under Colorado or Nevada law because, under the law of either jurisdiction, plaintiff has not stated any direct claims on behalf of the class members.  *See Ohanessian v. Pusey*, No. 09-cv-01113-JLK, 2010 WL 728549, at *1 (D. Colo. Feb. 25, 2010) ("claims premised on Defendants' alleged breaches of corporate duties of care and due diligence, which Plaintiffs claim led to a devaluation of their stock, are derivative in nature under either California or Colorado law and cannot be maintained in a direct action as pleaded").

individual or derivative must be determined from the nature of the wrong alleged and the relief, if any, which could result if plaintiff were to prevail." *Id.* at 352.  Courts undertaking such a determination "look to the body of the complaint, not to the plaintiff's designation or stated intention." *Id.*

Computershare argues that, because derivative claims belong to the corporation, any derivative claims plaintiff attempts to assert on behalf of the class members are duplicative of claims asserted on behalf of IEAM.  Docket No. 61 at 10.  The Court agrees.  By virtue of the fact that plaintiff brings all claims on behalf of IEAM, IEAM has not refused to assert any rights belonging to the corporation that would otherwise give rise to a derivative claim.  *See Kamen*, 500 U.S. at 96 (holding that the purpose of the Fed. R. Civ. P. 23.1 demand requirement is to "affor[d] the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation [and] it is only when demand is excused that the shareholder enjoys the right to initiate suit on behalf of his corporation in disregard of the directors' wishes" (quotations omitted)).  Moreover, to the extent plaintiff attempts to bring a derivative claim on behalf of the class members, plaintiff fails to satisfy the pleading requirements of Fed. R. Civ. P. 23.1.  Thus, to whatever extent plaintiff attempts to bring derivative claims on behalf of the class members, such claims are dismissed as duplicative and for failure to state a claim pursuant to Rule 23.1.

The question therefore becomes whether the facts alleged in plaintiff's complaint would confer standing on the class members to bring a direct action against Computershare.  "For a plaintiff to have standing to bring an individual action, he must be injured *directly* or *independently* of the corporation."  *Kramer*, 546 A.2d at 351

(emphasis in original); *see also Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990) (holding that shareholders with "direct, personal interest in a cause of action" have standing to bring a direct action, even when the corporation's rights are also implicated). This requires a plaintiff to establish that "the actions of the third party that injure the corporation . . . cause[d] him injury as a stockholder, unique to himself and not suffered by the other stockholders." *Nicholson v. Ash*, 800 P.2d 1352, 1357 (Colo. App. 1990). "A shareholder does not acquire standing to maintain a direct action when the alleged injury is inflicted on the corporation and the only injury to the shareholder is the indirect harm which consists of the diminution in the value of his or her shares." *Lapidus v. Hecht*, 232 F.3d 679, 683 (9th Cir. 2000) (citing *Elster v. Am. Airlines, Inc.*, 100 A.2d 219, 222 (Del. Ch. 1953)); *see also Bixler v. Foster*, 596 F.3d 751, 757 (10th Cir. 2010) (applying Colorado law and holding that diminution in value of shares is not a direct and personal injury, but an injury to the corporation). Here, plaintiff alleges that IEAM shares were traded at a market value of $450 million, but, by April 2009, "the market value of those shares was $0, representing a cumulative loss to public shareholders of $450 million." Docket No. 1 at 17, ¶ 62. The diminution in value of IEAM shares does not, by itself, constitute an injury sufficient to confer standing on the class members to assert a direct action. *See Bixler*, 596 F.3d at 757. Plaintiff's breach of contract and tort claims allege that "IEAM suffered monetary losses and liability including, but not limited to, approximately $88 million from the Computershare issuances" as well as "monetary losses and liability including, but not limited to, the fees and commissions earned by Computershare from IEAM." Docket No. 1 at 20, ¶¶ 81-82;

*see also id.* at 21, ¶ 87; *id.* at 22, ¶¶ 92, 96; *id.* at 23, ¶ 101.  Plaintiff's fraudulent

transfer claims seek the return of fees IEAM paid Computershare.  *Id.* at 24-27.  Such

losses are, on their face, losses to IEAM and plaintiff does not identify any facts that

suggest otherwise.  Plaintiff's complaint does not plead facts upon which to conclude

that the shareholders have a direct, personal interest in the claims asserted against

Computershare.  *Cf. Faro v. Corporate Stock Transfer, Inc.*, 883 So. 2d 896, 898 (Fla.

Dist. Ct. App. 2004) (holding that, pursuant to Uniform Commercial Code, "wrongful

refusal by the transfer agent to register a requested transfer makes the agent liable to

the damaged shareholder").  Plaintiff does not, for example, allege in support of his

fraud claim that IEAM shareholders relied on any representations made by

Computershare.  *See, e.g.*, Docket No. 1 at 20, ¶ 80 ("IEAM justifiably relied on the

material and false representations and/or omissions made by Computershare to its

extraordinary detriment").  Thus, plaintiff has not pled sufficient facts upon which to

conclude that the class members have standing to assert direct claims against

Computershare.

Plaintiff's argument that Computershare owed the class members a duty in tort

does not compel a different conclusion.  Assuming, without deciding, that plaintiff is

correct, direct actions can only be brought where a third party violates a duty owed to a

stockholder and the stockholder suffers an injury "unique to himself and not suffered by

the other stockholders."  *See Nicholson*, 800 P.2d at 1357.  Because plaintiff lacks

standing to bring a direct action against Computershare as an assignee of the class

members, to the extent plaintiff asserts claims for direct injury to the class members,

such claims are dismissed.

### B.  IEAM's Claims

#### 1.  *Negligence and Professional Negligence*

##### a.  Article 5 of the Agreement

Computershare argues that plaintiff's claims for negligence and professional negligence asserted on behalf of IEAM are barred by Article 5 of the Agreement. Docket No. 56 at 9.  Plaintiff responds by arguing that, under Colorado law, exculpatory clauses do not provide a shield against willful and wanton negligence and that he has sufficiently pled that Computershare acted recklessly or purposefully with respect to its obligations under the UCC, STA guidelines, and Plan.  Docket No. 60 at 6-7.  The Court does not interpret plaintiff's argument as disputing that the exculpatory clause bars his claims for negligence and professional negligence; rather, plaintiff appears to contend that his negligence and professional negligence claims allege that Computershare engaged in grossly negligent conduct, which is explicitly exempted from the Agreement's exculpatory clause.

The Court first considers whether Article 5 is enforceable to relieve Computershare of liability for conduct constituting ordinary negligence and professional negligence.  "The scope and validity of an exculpatory clause are questions of law." *McShane v. Stirling Ranch Prop. Owners Assoc., Inc.*, --- P.3d ----, 2015 WL 1843807, at *1 (Colo. App. April 23, 2015).  Although exculpatory clauses are generally disfavored in Colorado, they are not void under all circumstances.  *Squires v. Breckenridge Outdoor Educ. Ctr.*, 715 F.3d 867, 872 (10th Cir. 2013).  Colorado courts consider four factors in determining whether an exculpatory clause is enforceable: "(1)

the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language." *Jones v. Dressel*, 623 P.2d 370, 376 (Colo. 1981); *see also Squires*, 715 F.3d at 872.

Although neither party addresses these factors, the Court finds that the balance of factors dictates that the exculpatory clause is enforceable to bar plaintiff's negligence and professional negligence claims.  As for the first *Jones* factor, the Colorado Supreme Court has noted that a public duty is implicated when, among other things, the party seeking the benefit of an exculpatory clause is in an industry that is "suitable for public regulation," performs a service of great importance or a service that is a practical necessity to members of the public, possesses a decisive advantage in bargaining strength, or maintains control over the person or property likely to be harmed by the carelessness of its agents.  *Jones*, 623 P.2d at 376-77 (quoting *Tunkl v. Regents of Univ. of Cal.*, 383 P.2d 441, 444 (Cal. 1963)).  Although the securities industry may, in a general sense, be heavily regulated, the specific service that Computershare provides is not a practical necessity to members of the public, a fact which does not give rise to a disparity in bargaining strength.  Thus, this factor weighs in favor of enforcing the exculpatory clause.  *Cf. id.* at 377; *Chadwick v. Colt Ross Outfitters, Inc.*, 100 P.3d 465, 469 (Colo. 2004) ("Colt Ross provides a recreational service, neither publicly regulated nor of great public importance").

As to the second *Jones* factor, courts inquire as to whether utilizing the service provided by the party seeking to enforce the exculpatory clause is a matter of choice or

necessity.  *McShane*, 2015 WL 1843807, at *4.  Although many corporations now

employ transfer agents, the tasks undertaken by transfer agents can, in the case of

small corporations, be completed by the corporation's secretary or clerk or, in the case

of large corporations, by a staff dedicated to the task.  *See* Mark S. Rhodes, *Transfer of*

*Stock* § 22:1 (7th ed. 2015).  Thus, this factor weighs in favor of enforcing the

exculpatory clause.

As to the third *Jones* factor, "[a] contract is fairly entered into if one party is not

so obviously disadvantaged with respect to bargaining power that the resulting contract

essentially places him at the mercy of the other party's negligence."  *Hamill v. Cheley*

*Colorado Camps, Inc.*, 262 P.3d 945, 949 (Colo. App. 2011).  Here, plaintiff's complaint

does not allege any facts suggesting that the services Computershare provided could

not have been obtained elsewhere or that the parties' bargaining power was otherwise

unequal when they entered into the Agreement.  *See id.* at 949-50.  Thus, this factor

weighs in favor of enforcing the exculpatory clause.

As to the fourth *Jones* factor, an exculpatory clause "need not contain any magic

words to be valid; in particular, it need not specifically refer to waiver of 'negligence'

claims."  *Wycoff v. Grace Cmty. Church of Assemblies of God*, 251 P.3d 1260, 1265

(Colo. App. 2010).  Rather, the relevant inquiry is whether "the intent of the parties was

to extinguish liability and whether this intent was clearly and unambiguously expressed,"

which requires consideration of the agreement's actual language, length, and

complication as well as "any likelihood of confusion or failure of a party to recognize the

full extent of the release provisions."  *Squires*, 715 F.3d at 872-73 (quotations omitted).

Here, Article 5 states that Computershare "shall not be liable for any action taken or omitted to be taken in connection with this Agreement, except that Computershare shall be liable for direct losses incurred by the Company arising out of Computershare's gross negligence or willful misconduct."  Docket No. 1-2 at 7.  Although this provision does not specifically mention ordinary negligence, the fact that the clause exempts gross negligence implies that the waiver excuses Computershare from liability for other types of negligence.  Other language in Article 6 reinforces that intent.  Article 5, ¶ 2 specifically extinguishes Computershare's liability for the conduct giving rise to plaintiff's negligence and professional negligence claims, namely, "the authority of the Company to request such issuance" of any shares and "[a]cting upon any oral instruction, writing or document reasonably believed by Computershare to be genuine and to have been given, signed or made by an Officer."  Docket No. 1-2 at 8.  Thus, because the agreement explicitly relieves Computershare of liability for the relevant conduct, the Court finds that the parties intended, through Article 5, to relieve Computershare of liability for the conduct giving rise to plaintiff's negligence and professional negligence claims and did so in a clear and unambiguous manner.  *See McShane*, 2015 WL 1843807, at *5; *cf. Wycoff*, 251 P.3d at 1265 (rejecting exculpatory clause as void in part because contractual language "made no reference to the relevant activity").

Upon review of the *Jones* factors, the Court finds that the exculpatory provisions as set forth in Article 5 of the Agreement are valid and enforceable.  Plaintiff's negligence and professional negligence claims are therefore barred by the Agreement.

### b. Duty of Care

Even assuming that Article 5 did not bar plaintiff's negligence claims, plaintiff fails to establish the existence of a tort duty upon which to base such claims. A plaintiff alleging negligence must establish "the existence of a duty, a breach of that duty, causation, and damages." *Redden v. SCA Colo. Funeral Servs., Inc.*, 38 P.3d 75, 80 (Colo. 2001). When a plaintiff brings a professional negligence claim, the plaintiff must demonstrate that "the professional's conduct fell below the standard of care appropriate to the profession. . . . In sum, courts require claimants as part of a professional negligence claim, to establish the appropriate standard of care." *Id.* at 81. Thus, plaintiff must establish the appropriate standard of care with respect to both his negligence claims. As best the Court can discern from plaintiff's arguments, plaintiff takes the position that, prior to issuing any shares at the direction of IEAM officers, Computershare had a duty to "establish a reasonable basis for believing that (i) the 43 million unrestricted S-8 shares it issued were in the form and amount IEAM was authorized to issue under the S-8, and (ii) that those shares were being issued and transferred to eligible recipients." Docket No. 60 at 13. The Court is not convinced that plaintiff's articulation of the claimed duty is sufficiently clear as to establish a workable standard of care, which is, by itself, a sufficient reason for declining to impose such a duty on Computershare. The Court will nonetheless consider whether Colorado law recognizes the claimed duty.

A tort duty may be derived from "a legislative enactment of the standard of conduct or from a judicially imposed standard." *Dare v. Sobule*, 674 P.2d 960, 963

(Colo. 1984).  Plaintiff appears to contend that Computershare's alleged duty is created

by the UCC, STA guidelines, and the Plan.  Docket No. 60 at 6.  However, plaintiff cites

no statute – and the Court is aware of none – adopting the STA guidelines or stating

that a corporation's internal stock plan places a duty of care on transfer agents.

Although plaintiff argues that the UCC, specifically Colo. Rev. Stat. § 4-8-208, requires

a transfer agent to "have reasonable grounds to believe that the certified security is in

the form and within the amount the issuer is authorized to issue," Docket No. 60 at 5,

§ 4-8-208 sets forth the warranties that a transfer agent makes to a purchaser of a

certificated security.  *See* § 4-8-208 ("A person signing a security certificate as

authenticating trustee, registrar, transfer agent, or the like, warrants to a purchaser for

value of the certificated security . . . .").  IEAM was the issuer, not the purchaser, of the

shares at issue in this case; thus, § 4-8-208 does not apply to IEAM's claims against

Computershare.[10]  Moreover, § 4-8-208 appears to set forth a transfer agent's

_____

[10]By its terms, § 4-8-208 applies only to certificated securities, which the UCC
defines as "a security that is represented by a certificate."  § 4-8-102; *see also* § 4-8-
102 cmt. ("The term 'security certificate' refers to the paper certificates that have
traditionally been used to embody the underlying intangible interest."); William D.
Hawkland, James S. Rogers & Carl S. Bjerre, *Uniform Commercial Code Series* § 8-
208:02 (Frederick H. Miller ed. 2015) ("the rules in section 8-208 are applicable only to
security certificates").  Plaintiff does not allege that the shares at issue were certificated
securities.  *Cf.* § 4-8-102(a)(18) ("'Uncertificated security' means a security that is not
represented by a certificate."); *In re Cty. of Orange*, 219 B.R. 543, 553 (Bankr. C.D. Cal.
1997) ("The Noteholders have submitted a copy of one of the master certificates . . . as
evidence that the Notes are represented by certificates.  Therefore, the Notes are
certificated securities under Revised Article 8, §8102(a)(4).").  Thus, § 4-8-208 is not
applicable to the present dispute.  Even in a situation where a transfer agent signs a
security certificate, the notes to § 4-8-208 state that "[a]side from questions of
genuiness and excess issue, these parties are not held to certify as to the validity of the
security unless they specifically undertake to do so" and clarify that § 4-8-208 does not
"interfere with proper indemnity arrangements between the issuer and . . . transfer
agents."  § 4-8-208 cmt. 4, 5.  These provisions suggest that the parties, through

warranties to a purchaser of certificated securities, not a standard of care under which the transfer agent must act.  The statute does not suggest that the Colorado legislature intended for § 4-8-208 or any of the other UCC provisions upon which plaintiff relies to impose a tort duty on transfer agents to guard against the conduct forming the basis of plaintiff's tort claims.  Thus, plaintiff has failed to identify a legislative enactment of anything resembling the claimed tort duty.[11]

When a court imposes a duty of care, "the question is essentially one of fairness under contemporary standards – that is, would reasonable persons recognize and agree that a duty of care exists."  *Greenberg v. Perkins*, 845 P.2d 530, 536 (Colo. 1993).  A court should base its determination on factors such as "the risk involved, the foreseeability and likelihood of injury as weighed against the social utility of the defendant's conduct, the magnitude of the burden of guarding against the harm, and the consequences of placing the burden of a duty on the defendant."  *Ryder v. Mitchell,* 54 P.3d 885, 890 (Colo. 2002).  Courts may also consider "competing individual and

---

contract, may define the transfer agent's duties.

[11]Although plaintiff requests permission to amend his complaint to allege a direct claim under § 4-8-208, plaintiff's request is perfunctory and unsupported, which, by itself, is a sufficient reason to deny such a request.  *See* Docket No. 60 at 5 n.9. Moreover, in the absence of any argument to the contrary, the Court finds that such an amendment would be futile.  Contrary to plaintiff's claim that he has pled "the relevant facts and law," *id.*, there is no suggestion that Computershare issued certificated securities, which would otherwise place its conduct within the scope of § 4-8-208. Moreover, plaintiff cannot state a claim under § 4-8-208 on behalf of IEAM because IEAM was not a purchaser of the shares at issue.  And plaintiff cannot state a claim under § 4-8-208 on behalf of class members because plaintiff does not suggest that Computershare breached any of § 4-8-208's warranties with respect to the class members.  Plaintiff's request to amend his complaint to add a claim pursuant to § 4-8-208 is therefore denied.

social interests implicated by the particular facts of the case." *Id.* "Upon finding the existence of a duty, a court must then consider the scope of that duty and define the applicable standard of care." *Greenberg*, 845 P.2d at 536.

Plaintiff, as the party attempting to establish the existence of a duty of care, fails to address the relevant factors, a failure which is, by itself, a sufficient basis to reject plaintiff's argument that the claimed duty exists. As the Tenth Circuit has noted, it is not incumbent on a court to put the picture of a party's arguments together or otherwise advocate on a party's behalf, and the Court declines to do so in this case. *See Bird v. Regents of N.M. State Univ.*, --- F. App'x ----, 2015 WL 4646437, at *10 (10th Cir. Aug. 6, 2015) (unpublished). Although at least one treatise considers the STA guidelines to "represent the custom and practice in the industry," *see* Mark S. Rhodes, *Transfer of Stock* § 1:6 (7th ed. 2015), plaintiff cites no case – and the Court has found none – where a court has looked to the STA guidelines to establish a common law tort duty.[12] Moreover, although plaintiff's complaint cites multiple provisions of the STA guidelines, plaintiff's brief makes no attempt to identify applicable provisions or explain why they are applicable to the facts of this case. It is not incumbent upon the Court to perform such a task on plaintiff's behalf. To the extent plaintiff argues that the Court should infer a duty of care from the UCC, the UCC displaces common law claims "whenever

---

[12]The comments to Okla. Stat. § 8-308 and § 8-304 mention that the Securities Transfer Association has promulgated rules dealing with signature guarantees and endorsements. The comment to § 8-401 states that the rules of the STA serve to supplement Article 8 of the code and provide guidance to transfer agents. However, Oklahoma appears to be the only state to explicitly reference the Securities Transfer Association rules or guidelines, and such references do not provide a basis for imposing a tort duty under Colorado law.

both the code and the common law would provide a means of recovery for the same loss," which further counsels against imposing a duty of care based upon UCC provisions.  *See Clancy Sys. Int'l, Inc. v. Salazar*, 177 P.3d 1235, 1237 (Colo. 2008). As discussed above, plaintiff fails to establish that the UCC provisions upon which he relies apply to tort claims brought by IEAM for Computershare's failure to ensure that each share issuance was in compliance with the Plan.  *See Guilfoyle v. Olde Monmouth Stock Transfer Co., Inc.*, 335 P.3d 190, 194-95 (Nev. 2014) (noting that § 8-401 of the UCC, as enacted in Nevada, makes a transfer agent's duty to a stockholder for refusal to register stock "the same as an issuing corporation's").  Plaintiff provides no support for his contention that the Plan itself imposes a duty on Computershare.  Because plaintiff fails to identify the source of his claimed duty of care and otherwise fails to support his position with citation to authority and relevant factual allegations, plaintiff has not established the existence of his claimed duty.  Plaintiff therefore fails to state a necessary element of his negligence and professional negligence claims, including any claim that Computershare was grossly negligent.[13]  *Cf. Weil v. First Nat'l Bank of Castle*

---

[13]To the extent plaintiff attempts to assert a claim that Computershare was grossly negligent, plaintiff does not allege such a claim in his complaint.  Moreover, plaintiff does not provide sufficient facts upon which to conclude that Computershare's conduct rises to the level of gross negligence or willful misconduct, thereby falling outside the Agreement's exculpatory clause.  "Gross negligence is willful and wanton conduct, that is, action committed recklessly, with conscious disregard for the safety of others."  *Hamill v. Cheley Colo. Camps, Inc.*, 262 P.3d 945, 954 (Colo. App. 2011). Plaintiff argues that Computershare was grossly negligent in breaching its obligations under "(i) Colorado's UCC, (ii) the STA guidelines, and (iii) the S-8 and the Stock Option Plan."  Docket No. 60 at 6.  However, even assuming, without deciding, that Computershare possessed a copy of the Plan, plaintiff does not allege that Computershare knew of or acted in conscious disregard of the Mazzuto scheme during the time it received the issuance letters.  As a result, there are no facts suggesting that Computershare knew of or acted recklessly toward the possibility that the issuance

*Rock*, 983 P.2d 812, 815 (Colo. App. 1999) (dismissing negligence and gross negligence claims is appropriate where defendant owes no common law duty to plaintiff).[14]

### 2. *Breach of Contract*

Plaintiff's breach of contract claim alleges that Computershare failed to satisfy its obligations under the Agreement and "did not provide the services it agreed to provide pursuant to the terms of the agreement." Docket No. 1 at 23, ¶ 100. Specifically, plaintiff argues that the issuance letters directed Computershare to issue free trading shares "pursuant to [IEAM's] 2004 Stock Option plan" and to issue shares "pursuant to the previously provided S-8 registration statement dated January 24, 2005." *Id.* (quoting Docket No. 1-6).[15] Plaintiff interprets the reference in these letters to the Plan and to the S-8 registration statement as tantamount to requests that Computershare ensure that the issuance complied with those documents. Plaintiff contends that Computershare breached the Agreement by failing to determine such compliance

letters were suspect. Moreover, plaintiff does not allege sufficient facts upon which to conclude that Computershare knew of or acted recklessly toward the possibility that the share recipients were not bona-fide consultants for IEAM, and no facts indicating how Computershare could have acquired such knowledge even if it wanted to. Thus, plaintiff does not allege sufficient facts to establish a plausible inference that Computershare knew of or consciously disregarded the possibility that Mr. Mazzuto's and Mr. Margulies' issuance letters were designed to perpetuate a fraud.

[14]Because plaintiff fails to state a claim for gross negligence, the Court need not reach plaintiff's argument that Article 5's damages limitation is void as contrary to public policy. *See* Docket No. 60 at 7 n.11.

[15]Plaintiff concedes that the issuance letters did not place on Computershare a duty independent of the Agreement, but argues that the Agreement contemplated that Computershare would act at the direction of issuance letters signed by IEAM's officers. *Id.* at 4 n.5.

because, although the Plan provided for the issuance 15 million restricted shares of

IEAM stock to certain individuals, Computershare issued 43 million unrestricted shares

to individuals who were ineligible recipients under the Plan. *Id.* at 3-4. Plaintiff argues

that Computershare's obligation under the contract was to either refuse to issue shares

that conflicted with the Plan or to obtain documents necessary to resolve any such

conflict. *Id.* at 3-4 n.4.

Computershare argues that plaintiff fails to identify a specific provision of the

Agreement that it breached. Docket No. 61 at 2. Computershare argues, without

dispute, that plaintiff's complaint does not allege that Computershare was provided a

copy of the Plan and further argues that the Agreement does not require

Computershare to search IEAM's public filings for certain documents. Docket No. 56 at

2; *see also* Docket No. 60 at 3-4. Computershare contends that the Agreement does

not place upon it an obligation to become aware of what restrictions IEAM placed on its

shares, to only issue shares conforming to the Plan, and to refuse to follow IEAM's

officers' directives if such directives were contrary to the Plan. Docket No. 56 at 2;

Docket No. 61 at 2-3.

The Court agrees with Computershare. Article 3 of the Agreement, the only

portion of the Agreement upon which plaintiff's complaint relies, provides that

Computershare shall transfer[16] shares "upon the presentation to Computershare of

---

[16]Computershare argues that Article 3, ¶ 1 applies only to the transfer, not the issuance, of shares and is therefore inapplicable to the present dispute. Docket No. 56 at 7. The Court is somewhat skeptical of this interpretation of the Agreement. Although the terms "issuance" and "transfer" may, in some cases, describe different concepts or processes, Article 3 is entitled "ISSUANCE AND TRANSFER OF SHARES," but does not describe a separate process for issuing shares, which suggests that the issuance

stock transfer instructions properly endorsed if Shares are in uncertificated form."
Docket No. 1-2 at 5.  Article 3 further states that "[s]uch . . . transfer instructions shall be
accompanied by such documents as are reasonably necessary to evidence the
authority of the person making the transfer."  *Id.*  The Agreement grants Computershare
the right to place additional requirements on transfer instructions, but not the obligation
to do so.  *Id.*[17]  Computershare may then, in an exercise of its discretion, "refuse to
transfer Shares until it is satisfied that the requested transfer is legally authorized."  *Id.*
at 6.  Thus, the Agreement focuses on the authority[18] of the person requesting the
transfer as opposed to the propriety of the transfer itself.

Plaintiff does not argue that the issuance letters were not properly endorsed.
Although it is not entirely clear who has the obligation of ensuring that documents

---

and transfer process are one and the same.  Docket No. 1-2 at 5.  However, for the
reasons stated below, assuming, as plaintiff suggests, that Article 3, ¶ 1 governs the
transfer and the issuance of shares, plaintiff fails to state a claim that Computershare
breached its obligations under Article 3 of the Agreement.

[17]To the extent plaintiff's general allegations concerning the content of Article 3
of the Agreement, *see* Docket No. 1 at 10, ¶ 34, are contradicted by the specific
language of the Agreement, the Court need not and does not presume the truth of such
allegations.  *See Toone*, 716 F.3d at 521.

[18]The term "authority" as it is used in Article 3, ¶ 1 is not precisely defined.  The
fact that the term is used in reference to the "person" making the transfer suggests that
the requisite supporting documentation is aimed at ensuring that the person issuing the
transfer order is who he or she purports to be and has sufficient authority within IEAM
to direct the transfer agent to issue or transfer shares.  This interpretation is supported
by the remainder of the Agreement, which directs IEAM to provide Computershare with,
among other things, "A list of the Officers *authorized* to provide instructions to
Computershare, with specimen signatures of such Officers."  Docket No. 1-2 at 3-4,
¶ 4.h (emphasis added).  The term does not therefore suggest that the term "authority"
encompasses the question of whether the company itself has the authority under an
employee benefit plan to issue shares.

sufficiently support the requester's authority to issue the instructions, by virtue of the

fact that Computershare, at its discretion, may require additional documentation in

support of transfer requests, it appears that it is IEAM who has this obligation, not the

other way around.  Although Computershare may refuse to transfer shares if it is not

satisfied that the transfer is legally authorized – which Article 3, ¶ 1 indicates may occur

if Computershare deems the transfer improper, unauthorized, or not in compliance with

Computershare's procedures –, the agreement does not identify, let alone suggest, a

circumstance where Computershare would be contractually obligated to refuse to

transfer shares.  Article 3, ¶ 1 contains no terms suggesting that Computershare is

obligated to investigate each transfer request or that Computershare is obligated to

determine whether a properly endorsed transfer request is in conformance with a

corporation's employee benefits stock plan.  In other words, Article 3 does not contain

any language suggesting that, when the Plan or S-8 registration statement is invoked in

an issuance letter, Computershare is contractually obligated to refuse to issue shares

until it independently determines whether the requested issuance complies with the

Plan or S-8 registration statement.  If such an obligation exists in the Agreement,

plaintiff fails to identify it, and no such obligation is apparent to the Court.  Article 3 of

the Agreement grants Computershare the right to request more information from IEAM

and the right to refuse to transfer shares, but does not obligate it to do so under the

circumstances alleged in plaintiff's complaint.  Plaintiff fails to identify contractual

provisions suggesting otherwise and, as a result, fails to state a claim for breach of

contract.[19]

The remainder of the Agreement is consistent with Computershare's position. The scope of services Computershare is obligated to provide is set forth in Schedule A of the Agreement. Nothing in Schedule A suggests that Computershare will provide a service by which it independently confirms the propriety of each stock issuance against an employee stock option plan. *See* Docket No. 1-2 at 18.[20]   Moreover, plaintiff does not suggest a mechanism or class of documents by which Computershare could independently ascertain whether, for example, a particular recipient was a "bona fide consultant" entitled to receive shares under the Plan. *See* Docket No. 1 at 9, ¶ 31 (emphasis omitted).

Plaintiff argues that the Court should interpret the issuance letters as commanding Computershare to issue shares "only if [the issuance] compl[ies] with the Stock Option Plan."  Docket No. 60 at 4-5.  This interpretation of the issuance letters defies common sense.  Plaintiff alleges that Mr. Mazzuto's and Mr. Margulies' goal was

---

[19]Plaintiff's complaint cites Article 3, ¶ 2 in support of the allegation that Computershare may request a legal opinion from IEAM's counsel before issuing restricted shares.  Docket No. 1 at 10, ¶ 35.  Although plaintiff's complaint alleges that Article 3, ¶ 2 obligates Computershare to request a legal opinion, *id.* at 10, ¶ 36, such allegations are belied by the plain terms of the Agreement, which confer upon Computershare the right, not the obligation, to request a legal opinion.  Moreover, paragraph two applies to "Shares in certificate form."  Docket No. 1-2 at 6.  Plaintiff does not allege that the shares at issue were certificated.  *See* Colo. Rev. Stat. § 4-8-102(4), (18) (defining "certificated" and "uncertificated" securities).

[20]Schedule A of the Agreement states, in relevant part, that Computershare will maintain records of "restrictions on any Shares of which it has been informed," Docket No. 1-2 at 18, but plaintiff does not argue that this provision was breached.  As discussed above, there is no allegation or evidence that IEAM provided Computershare with the Plan.

to "artificially inflate IEAM's stock price so that they could illegally cash in on this through the perversion of IEAM's S-8 Stock Option Plan."  Docket No. 1 at 6, ¶ 20. Plaintiff's interpretation of the issuance letters suggests that Mr. Mazzuto and Mr. Margulies had a psychologically conflicted, self-confessional intent to cause Computershare to uncover their scheme.  The logical and obvious interpretation of the letters is the opposite – that Mr. Mazzuto's and Mr. Margulies' references to the Plan and the S-8 registration statement were intended to convey their view that such documents permitted the issuances.  More importantly, plaintiff concedes that the issuance letters do not themselves place a contractual obligation on plaintiff and, as discussed above, nothing in the Agreement obligates Computershare to independently verify the propriety of Mr. Mazzuto's and Mr. Margulies' issuance requests against the Plan.  Thus, plaintiff's argument is without merit.

Plaintiff next argues that the Court should look to the STA guidelines in resolving any ambiguity in the agreement.  Docket No. 60 at 5.  Plaintiff's argument is somewhat difficult to interpret.  To the extent plaintiff argues that the Agreement should be interpreted in light of the STA guidelines, plaintiff's argument is unsupported. Assuming, without deciding, that the STA guidelines are evidence of industry standards, plaintiff does not identify any particular term in the Agreement that has an alternate meaning when interpreted in light of the STA guidelines.  *See Employment Television Enters., LLC v. Barocas*, 100 P.3d 37, 43 (Colo. App. 2004).  Thus, plaintiff fails to show how interpreting the Agreement in light of the STA guidelines would lead to a different result.

Even assuming that plaintiff sufficiently stated a claim that Computershare

breached an obligation under the Agreement, as discussed above, the exculpatory clause is enforceable and limits Computershare's liability accordingly.  In arguing that his breach of contract claim does not fall within the exculpatory clause, plaintiff attempts to characterize his claim as asserting that Computershare failed to follow the instructions set forth in the issuance letters, and not that Computershare failed to ensure that IEAM had the authority to issue the relevant shares.  Docket No. 60 at 4 n.7.  Plaintiff's argument is unavailing.  Not only does plaintiff fail to identify a contractual provision supporting his theory of liability, but the issuance letters themselves do not direct or place a contractual duty on Computershare to refrain from issuing shares until it is independently satisfied that the issuances complied with the Plan.  *See* Docket No. 60 at 4 n.5.  Because plaintiff's breach of contract claim arises from actions taken or not taken in connection with the Agreement and from IEAM – acting through Mr. Mazzuto and Mr. Margulies – exceeding its authority under the Plan to issue shares, Article 5, ¶¶ 1 and 2 relieve Computershare of liability for such a claim.  Computershare's motion to dismiss is granted as to plaintiff's breach of contract claim.

### 3.  *Unjust Enrichment*

Plaintiff's unjust enrichment claim seeks "restitution for the value of the fees and commissions received by Computershare."  Docket No. 1 at 22, ¶ 96.  "Unjust enrichment is a claim in quasi-contract based on principles of restitution."  *W. Ridge Grp., LLC v. First Trust Co. of Onaga*, 414 F. App'x 112, 120 (10th Cir. 2011) (unpublished) (applying Colorado law).  "In general, a party cannot recover for unjust enrichment by asserting a quasi-contract when an express contract covers the same subject matter because the express contract precludes any implied-in-law contract."

*Interbank Investments, LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816

(Colo. App. 2003).  Colorado courts recognize two exceptions to this general rule.

"First, a party can recover on a quasi-contract when the implied-in-law contract covers

conduct outside the express contract or matters arising subsequent to the express

contract.  Second, a party can recover on a quasi-contract when the party will have no

right under an enforceable contract," such as "when an express contract failed or was

rescinded."  *Id.* (citations and quotations omitted).

Plaintiff points out that it is permitted to plead an unjust enrichment claim in the

alternative to its breach of contract claim.  Docket No. 60 at 3 n.2.  Although it may be

appropriate to assert both a breach of contract claim and an unjust enrichment claim in

the same complaint, *see Hemmann Mgmt. Servs. v. Mediacell, Inc.*, 176 P.3d 856, 860

(Colo. App. 2007), Computershare argues that, because IEAM's and Computershare's

relationship is expressly governed by the Agreement, plaintiff cannot bring an unjust

enrichment claim based upon conduct covered by the Agreement.  Docket No. 56 at 9.

Plaintiff responds that its unjust enrichment claim "covers conduct outside the express

contract" because, in addition to asserting that Computershare breached the

Agreement, plaintiff also asserts that Computershare violated its duties under the UCC

and state tort law.  Docket No. 60 at 3 n.2.  Plaintiff's theory misses the mark.  Plaintiff's

unjust enrichment claim asserts that, in return for its role in facilitating the illegal

issuance of stock, Computershare received fees and commissions at IEAM's expense.

Docket No. 1 at 22, ¶ 94.  Computershare issued stock pursuant to the Agreement.

The Agreement set forth the fees due Computershare for its services.  Article 5 of the

Agreement explicitly sets forth the terms under which Computershare is liable for failing

to perform its contractual obligations, including that "[a]ny liability of Computershare shall be limited to the amount of fees paid by the Company to Computershare in the preceding twelve (12) months for the Services."  Docket No. 1-2 at 7.  Plaintiff does not allege that its unjust enrichment claim arises based upon conduct that occurred after the contractual relationship between IEAM and Computershare expired.  Thus, the conduct giving rise to plaintiff's unjust enrichment claim is covered by the Agreement. *See Greenway Nutrients, Inc. v. Blackburn*, 33 F. Supp. 3d 1224, 1261-62 (D. Colo. 2014) ("There was an express contract covering any claim for loss of good and services . . . .  Therefore, an unjust enrichment claim for goods or services is precluded"); *Interbank*, 77 P.3d at 817 ("the contracts contemplated payment from tap fees to be collected over time").

As for the second exception, the threshold determination is not the adequacy of the remedy under an express contract, but rather its enforceability.  *Id.* at 818-19. Plaintiff does not assert that any aspect of the Agreement is unenforceable.  Thus, plaintiff's unjust enrichment claim is precluded by the Agreement.  *Cf. Rossetti Assocs., Inc. v. Santa Fe I25 Denver, LLC*, No. 09-cv-00338-WJM-BNB, 2011 WL 834177, at *7 (D. Colo. March 4, 2011) (dismissing breach of contract claim and concluding that, "because there is an enforceable contract between the two parties, the express contract precludes the unjust enrichment claim" (citing *Interbank*, 77 P.3d at 818-19)).

Computershare's motion to dismiss as to plaintiff's unjust enrichment claim is granted.

### 4. Fraud

Computershare argues that plaintiff fails to state a claim for fraud.  Docket No.

56 at 10.  A claim for fraud requires a plaintiff to prove that (1) the defendant knowingly

made a false representation of material fact; (2) plaintiff was unaware of its falsity; (3)

the representation was intended to induce plaintiff to act; and (4) plaintiff was damaged

by acting in reliance on the representation.  *Vinton v. Virzi*, 269 P.3d 1242, 1247 (Colo.

2012).  Under Federal Rule of Civil Procedure 9(b), "fraud or mistake" must be pled with

particularity, meaning that a plaintiff must, at the minimum, "set forth the time, place

and contents of the false representation, the identity of the party making the false

statements and the consequences thereof."  *United States ex rel. Sikkenga v. Regence

Bluecross Blueshield of Utah*, 472 F.3d 702, 727 (10th Cir. 2006) (quoting *Koch v. Koch

Indus.*, 203 F.3d 1202, 1236 (10th Cir. 2000)).  Although a plaintiff may plead "[m]alice,

intent, knowledge, and other conditions of a person's mind" generally, Rule 9(b) "merely

excuses a party from pleading discriminatory intent under an elevated pleading

standard.  It does not give him license to evade the less rigid–though still

operative–strictures of Rule 8."  *Ashcroft*, 556 U.S. at 686-87.

Plaintiff alleges that IEAM reasonably relied on Computershare's expertise as a

transfer agent to, among other things, "check the types of shares being issued (as well

as the overall among of the shares issued) against the basic terms of [the] Plan."

Docket No. 1 at 17, ¶ 60.  Plaintiff alleges that, "[b]y the simple act of issuing and

transferring the S-8 shares in question, Computershare – as a professional transfer

agency – represented to IEAM that it had checked the credentials of those directing the

issuances, the bona fides of the recipients, and the number of shares authorized, and that the issuances were, in fact, proper under the Plan." *Id.* at 19, ¶ 75. Thus, plaintiff's position appears to be that Computershare's act of issuing stock as directed by the issuance letters constitutes a representation that the shares "conformed in both form and amount with the S-8 and the Stock Option Plan," were "being issued and transferred to eligible recipients," and conformed to the STA guidelines. Docket No. 60 at 10-11.

As to the first element regarding a false representation, plaintiff's position contradicts the plain meaning of the issuance letters, as discussed above. Mr. Mazzuto and Mr. Margulies were not asking Computershare to warrant the legality of the issuance of the shares. Second, plaintiff's position is not supported by the terms of the Agreement, which do not state or imply that Computershare had the responsibility to conduct the type of investigation that plaintiff alleges. As to the second element regarding IEAM's unawareness of the falsity, even assuming that Computershare explicitly made such representations to IEAM, plaintiff's allegation that IEAM was unaware of the falsity of Computershare's representation is conclusory and contradicted by more specific allegations. *See* Docket No. 1 at 19, ¶ 77. "It is long-settled law that if a party claiming fraud has access to information that was equally available to both parties and would have led to the true facts, that party has no right to rely on a false representation." *Vinton*, 269 P.3d at 1247. IEAM promulgated the Plan, Docket No. 1 at 8, ¶ 27, and, therefore, had access to the very information that would have led to the conclusion that the shares issued pursuant to the issuance letters were in contravention of the Plan. Even viewing the facts in the appropriate light, such an

inference does not plausibly flow from plaintiff's complaint.

As to the third element regarding an intent to induce action, plaintiff does not explain what action Computershare intended to induce from IEAM.  Plaintiff generally alleges that Computershare's alleged representations were made "with the intent that IEAM would rely upon them" or "with the intent that IEAM would rely on its incorrect knowledge of the true facts."  Docket No. 1 at 20, ¶ 78.  However, recognizing that intent need not be pled with particularity, such allegations are conclusory and, absent factual allegations establishing what acts the representations were intended to induce, are insufficient to satisfy this element.  *See Ashcroft*, 556 U.S. at 686-87.  Because plaintiff has failed to adequately plead the first three elements of his fraud claim, Computershare's motion as to this claim is granted.

### 5. *Economic Loss Rule*

In the alternative, plaintiff's tort-based claims are barred by the economic loss rule.  The economic loss rule is intended to maintain a boundary between contract law and tort law.  *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1259 (Colo. 2000).  "[A] party suffering only economic loss from the breach of an express or implied contractual duty may not asset a tort claim for such a breach absent an independent duty of care under tort law."  *Id.* at 1264.  In order to be considered independent of contract, a duty of care must satisfy two conditions: "[f]irst, the duty must arise from a source other than the relevant contract"; and "[s]econd, the duty must not be a duty also imposed by the contract."  *Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*, 573 F.3d 947, 962 (10th Cir. 2009) (citing *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d

1256, 1259-62 (Colo. 2000)).  In other words, "even if the duty would be imposed in the absence of a contract, it is not independent of a contract that memorializes it."  *Id.* (quotation and citation omitted).  As discussed above, plaintiff fails to identify a non-contractual, common law or statutory tort duty that governs the acts and omissions giving rise to plaintiff's negligence, professional negligence, or unjust enrichment claims.  As to plaintiff's fraud claim, Colorado courts have held that claims of post-contractual fraud related to the performance of the contract are barred by the economic loss rule, particularly where, as here, a plaintiff alleges only economic losses.  *See Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 293-94 (Colo. App. 2009).

Moreover, the purpose of the economic loss rule is to, among other things, allow the parties to "reliably allocate risks and costs during their bargaining [and] encourage the parties to build the cost considerations into the contract because they will not be able to recover economic damages in tort."  *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 72 (Colo. 2004).  Article 5 of the Agreement suggests that, by memorializing Computershare's obligations to IEAM and limiting Computershare's liability therefrom, Computershare and IEAM engaged in just such an allocation and cost calculation.  *See* Docket No. 1-2 at 7 ("it being understood that the Services could not be provided to the Company by Computershare at the prices set forth herein without the foregoing liability limitation").  Thus, the Court concludes that, in the alternative, the economic loss rule bars plaintiff's tort-based claims.

### 6. Fraudulent Transfer

Plaintiff's sixth through tenth claims allege that the fees IEAM paid to

Computershare pursuant to the Agreement should be voided as fraudulent transfers.

Docket No. 1 at 25-27.[21]   Computershare's only argument going to the merits of

plaintiff's fraudulent transfer claims is that plaintiff fails to identify the specific transfers

he seeks to avoid.  Docket No. 56 at 5; Docket No. 61 at 11 n.14.  Computershare does

not support its argument with citation to authority or any additional explanation.  Courts

hold differing views on the question of whether a plaintiff's complaint must specifically

identify each allegedly fraudulent transfer by date and amount.  *See In re Del-Met*

*Corp.*, 322 B.R. 781, 795 (Bankr. M.D. Tenn. 2005) (recognizing different approaches

to satisfying Fed. R. Civ. P. 8 in fraudulent transfer actions).  Some courts take a strict

approach to this question, holding that a plaintiff bringing a preferential transfer cause

of action must plead "(a) an identification of the nature and amount of each antecedent

debt and (b) an identification of each alleged preference transfer by (i) date, (ii) name of

debtor/transferor, (iii) name of transferee and (iv) the amount of the transfer."  *In re*

*TWA Inc. Post Confirmation Estate*, 305 B.R. 228, 232 (Bankr. D. Del. 2004) (quotation

omitted); *see also In re Greater Se. Cmty. Hosp. Corp. I*, 341 B.R. 91, 105 (Bankr.

---

[21]The last paragraph of plaintiff's ninth claim for relief states that the "stock transfers are avoidable fraudulent transfers and should be avoided under 11 U.S.C. § 548(a)."  *Id.* at 26, ¶ 136.  Thus, it is somewhat unclear whether this claim asserts that the fee transfers to Computershare or the stock transfers to various third parties are avoidable.  To the extent plaintiff seeks to set aside any issuance or transfer of stock, plaintiff does not allege that Computershare was the recipient of any such stock transfers and would not therefore be a proper defendant as to any claim to recover shares of IEAM stock.  Thus, viewing the facts in the light most favorable to plaintiff, the Court construes plaintiff's ninth claim for relief in accordance with plaintiff's other fraudulent transfer claims, which seek to avoid fee payments made to Computershare.

D.D.C. 2006) (adopting *TWA*'s formulation of pleading requirements for § 550 action).

Other courts take a more liberal approach, holding that, under Rule 8's notice pleading

standard, a complaint must simply allege sufficient facts upon which to conclude that

money was transferred from a debtor to defendant and that the transfer violated the

Uniform Fraudulent Transfer Act. *Miller v. Rodak*, 2012 WL 3156538, at *2-*3 (D. Utah

Aug. 3, 2012) (rejecting argument that complaint was deficient for failure to identify the

dates of the purported transfers, the amounts of the purported transfers, and the

natures of the purported transfers). The strict approach has been criticized as contrary

to liberal pleading rules – which shift the focus towards discovery and motions for

summary judgment – and as having the unintended consequence of cutting off valid

claims prematurely. *In re The IT Grp., Inc.*, 313 B.R. 370, 373 (Bankr. D. Del. 2004).

The Court finds this criticism of the strict approach persuasive. Moreover, the Court is

unaware of any Tenth Circuit authority favoring the strict approach articulated in *TWA*

and its progeny and will not therefore adopt it. Here, plaintiff's complaint does not

identify when IEAM transferred funds to Computershare and the amount of such

transfers, except to allege that, pursuant to the Agreement, Computershare received

$7,800 per year plus incidentals, Docket No. 1 at 9, ¶ 33, and to suggest that

Computershare received commission for each transaction in which it participated.

Docket No. 1 at 17, ¶ 61.[22] The Agreement's fee schedule states that, in addition to a

---

[22]Although plaintiff's complaint generally alleges that Computershare received
commissions, it does not indicate the number and amount of such commissions and
plaintiff's brief does not assert that fees IEAM paid in the form of commissions are a
basis for his claims. Moreover, the Agreement's fee schedule does not appear to
provide for the payment of commissions to Computershare based upon each issuance
of stock. *See* Docket No. 1-2 at 20-21. Nonetheless, viewing the facts in the light most

one-time setup fee of $1,250, Computershare's annual $7,800 fee was billed monthly. Docket No. 1-2 at 20. Plaintiff's brief, however, states that the fee transfers between IEAM and Computershare occurred monthly from January 2005 through January 2008. Docket No. 60 at 16, n.20 (citing Docket No. 1-2; Docket No. 1-4).[23] Thus, plaintiff appears to take the position that the fee transfers he seeks to avoid occurred between January 2005 and January 2008. Plaintiff does not identify any transfers to Computershare that took place after January 2008. The Court finds that, for purposes of resolving this motion, plaintiff has stated a plausible claim that, between January 2005 and January 2008, IEAM transferred to Computershare $7,800 in annual fees each year plus commissions. This is sufficient to state a claim that funds were transferred from IEAM to Computershare.[24] *See Miller*, 2012 WL 3156538, at *2.

Computershare's next argument is that plaintiff's fraudulent transfer claims are barred by the statute of limitations. Docket No. 56 at 19. Computershare argues that,

---

favorable to plaintiff, the Court assumes that Computershare received commissions in addition to its annual fee of $7,800.

[23]Docket No. 1-4 appears to be a list of stock issuances that took place between January 24, 2005 and January 16, 2008. Viewing plaintiff's argument charitably, plaintiff appears to contend that Computershare acted as IEAM's transfer agent for the listed transactions and, as a result, received fee payments from IEAM during that time period.

[24]The Court recognizes that plaintiff brings claims for both actual fraudulent transfer and constructive fraudulent transfer. Courts in the Tenth Circuit are generally of the opinion that, whereas claims for actual fraudulent transfer may be subject to Fed. R. Civ. P. 9(b)'s heightened pleading standard, constructive fraudulent transfer claims are not subject to Rule 9(b). *In re Vaughan Co., Realtors*, 481 B.R. 752, 757, 763 (Bankr. D.N.M. 2012). Regardless of which approach is applied in this case, the Court finds that plaintiff has sufficiently alleged facts regarding the transfers that give rise to plaintiff's fraudulent transfer claims.

because plaintiff first asserted fraudulent transfer claims on October 30, 2013 – the day

he filed the present case –, plaintiff's fraudulent transfer claims are barred by Colo.

Rev. Stat. § 38-8-110 and 11 U.S.C. § 546.  *Id.* at 20.  Computershare maintains that,

because plaintiff did not assert any fraudulent transfer claims against it in the Delaware

bankruptcy proceeding, Computershare has not waived any statute of limitations

arguments with respect to such claims.  *Id.*  Plaintiff does not dispute that he asserts

fraudulent transfer claims against Computershare for the first time in the present case.

Rather, plaintiff argues that, had he amended his complaint in the Delaware adversary

proceeding to add fraudulent transfer claims, such claims would have related back to

the original complaint filed in the Delaware adversary proceeding pursuant to Fed. R.

Civ. P. 15(c)(1)(B).  Docket No. 60 at 17.  Computershare replies that plaintiff's

argument is speculative and that Rule 15(c) would not have permitted the addition of

fraudulent transfer claims in the manner plaintiff suggests.  Docket No. 61 at 11.[25]  The

Court agrees with Computershare that plaintiff's argument is speculative in nature, but

will nonetheless consider the merits of plaintiff's argument.

    As a threshold matter, the Court understands plaintiff to argue that his fraudulent

transfer claims are timely in relation to the original complaint in the Delaware adversary

proceeding, *see* Docket No. 60 at 16-17 n.20, not that such claims are timely asserted

---

[25]Plaintiff does not suggest that Computershare could not have disputed the applicability of Rule 15(c) if plaintiff had requested to amend his complaint in the Delaware adversary proceeding, and the Court finds no basis for so concluding.  Thus, the Court finds that Computershare's argument on this issue is not precluded by its waiver of "any argument based on the applicable statute of limitations to the extent it could not have raised them in this adversary proceeding."  *See In re Pitt Penn*, No. 11-51877-BLS (Docket No. 82 at 5 (quotation omitted)).

in this case regardless of whether the claims could have been brought in the adversary

proceeding.[26]   Thus, there appears to be no dispute that, absent the relation back of

---

[26]Plaintiff's sixth, seventh, and eighth claims are brought pursuant to the Colorado Uniform Fraudulent Transfer Act ("CUFTA").  Plaintiff's sixth and seventh claims for relief allege that the fee transfers to Computershare are fraudulent pursuant to Colo. Rev. Stat. § 38-8-105(1)(a) and § 38-8-105(1)(b), respectively, and plaintiff's eighth claim for relief is brought pursuant to § 38-8-106(1).  Docket No. 1 at 23-25.  Claims under § 38-8-105(1) and § 38-8-106(1) are extinguished unless, as relevant here, the claim is brought "within four years after the transfer was made or the obligation was incurred."  § 38-8-110(1)(a)-(b).  When, as here, CUFTA claims are brought pursuant to 11 U.S.C. § 544(b), the CUFTA statute of limitations "applies only to determine whether the trustee has a viable cause of action as of the bankruptcy filing date."  *See In re Leach*, 380 B.R. 25, 29 (Bankr. D.N.M. 2007).  Once the bankruptcy petition is filed, § 546 governs the time for bringing a CUFTA fraudulent transfer action.  *Id.* at 29-30; *see also In re Valley Mortg., Inc.*, 2013 WL 5314369, at *3 (Bankr. D. Colo. Sep. 18, 2013); *In re Dry Wall Supply, Inc.*, 111 B.R. 933, 936 (D. Colo. 1990) ("'Once the case has commenced, section 546(a) . . . specifies the time within which the trustee must act under section 544(b)'" (quoting 4 *Collier on Bankruptcy* ¶ 544.03[2] (L. King 15th ed. 1989))).  Plaintiff's ninth claim for relief alleges that the fee transfers to Computershare were fraudulent pursuant to 11 U.S.C. § 548.  Docket No. 1 at 26, ¶¶ 131-35.  Pursuant to § 548(a)(1), a trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that was made or incurred on or within two years before the date of the filing of the bankruptcy petition, provided the transfer satisfies certain conditions.  *See In re Leach*, 380 B.R. at 28 (holding that transfers occurring prior to applicable § 548 limitations period were barred).  Section 546(a) provides that § 544(b) and § 548 actions must be commenced, as relevant here, before the later of "(A) 2 years after the entry of the order for relief; or (B) 1 year after the appointment or election of the first trustee . . . if such appointment or such election occurs before the expiration of the period specified in subparagraph (A)."  § 546(a).

On May 1, 2009, IEAM filed a voluntary Chapter 11 petition, *In re Indus. Enters. of Am, Inc.*, No. 09-11508-BLS (Docket No. 1), which constitutes an order for relief.  § 301(b) ("The commencement of a voluntary case under a chapter of this title constitutes an order for relief under such chapter.").  On May 3, 2013, the Delaware bankruptcy court appointed plaintiff Chapter 11 trustee.  *In re Pitt Penn Holding Co.*, No. 09-11475-BLS (Docket No. 1729).  Pursuant to § 546(a)(1)(A), all fraudulent transfer claims were required to be brought by May 1, 2011.  Because the appointment of plaintiff as trustee occurred after May 1, 2011, § 546(a)(1)(B) does not apply to extend the statute of limitations.  Thus, absent the relation back of plaintiff's sixth, seventh, eighth, and ninth claims for relief, such claims are not timely asserted in this proceeding.  Plaintiff's tenth claim for relief, which is brought pursuant to § 550, is addressed below.

plaintiff's fraudulent transfer claims to the original complaint filed in the Delaware

adversary proceeding, such claims are untimely asserted for the first time in the present

case.

Fed. R. Civ. P. 15(c)(1)(B), which is applicable to bankruptcy proceedings

pursuant to Fed. R. Bankr. P. 7015, states: "An amendment to a pleading relates back

to the date of the original pleading when . . . the amendment asserts a claim or defense

that arose out of the conduct, transaction, or occurrence set out – or attempted to be

set out – in the original pleading."

> As a general rule, amendments will relate back if they amplify the facts
> previously alleged, correct a technical defect in the prior complaint, assert a
> new legal theory of relief, or add another claim arising out of the same facts.
> For relation back to apply, there is no additional requirement that the claim
> be based on an identical theory of recovery.   On the other hand,
> amendments generally will not relate back if they interject entirely different
> facts, conduct, transactions or occurrences.  It is a matter committed to the
> district court's sound discretion to decide whether a new claim arises out of
> the same transaction or occurrence.

*Benton v. Bd. of Cty. Commr's*, No. 06-cv-01406-PSF-MEH, 2007 WL 4105175, at *3

(D. Colo. Nov. 14, 2007); *see also Laratta v. Raemisch*, No. 12-cv-02079-MSK-KMT,

2014 WL 1237880, at *15 (D. Colo. March 26, 2014) (quoting *Benton*); *In re Bennett

Funding Grp. Inc.*, 275 B.R. 447, 451 (Bankr. N.D.N.Y. 2001); *In re Universal Factoring

Co.*, Inc., 279 B.R. 297, 303 (Bankr. N.D. Okla. 2002).  The key consideration is

whether the original complaint "gave the Defendant adequate notice of what must be

defended against in the Amended Complaint."  *In re Bennett*, 275 B.R. at 451

(collecting cases); *see also Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 149 n.3

(1984) ("The rationale of Rule 15(c) is that a party who has been notified of litigation

concerning a particular occurrence has been given all the notice that statutes of

limitations were intended to provide."); *In re Universal*, 279 B.R. at 303 ("'[T]he courts

also inquire into whether the opposing party has been put on notice regarding the claim

or defense raised by the amended pleading.  Only if the original pleading has

performed that function . . . will the amendment be allowed to relate back to prevent the

running of the limitations period in the interim from barring the claim or defense.'"

(quoting 6A Charles Alan Wright et al., *Federal Practice & Procedure* § 1497 (2d ed.

1990)).

Plaintiff's argument that his fraudulent transfer claims relate back to the original

complaint in the Delaware adversary proceeding (the "original complaint") [*IEAM*, No.

11-51877-BLS (Docket No. 1)] is flawed for multiple reasons.  First, his argument is

perfunctory and unsupported by specific reference to the original complaint.  *See*

Docket No. 60 at 17.  Plaintiff does not identify, even with a general citation, any factual

allegations that would place Computershare on notice that it may have to defend

against a fraudulent transfer claim based upon the fees it received pursuant to the

Agreement.  Plaintiff's argument is therefore little more than an implicit invitation for the

Court to parse the original complaint on plaintiff's behalf in search of support for his

position.  The Court declines the invitation.  Plaintiff's failure to support his argument is,

by itself, a sufficient reason to decline to apply the relation back doctrine to plaintiff's

fraudulent transfer claims.

Second, even assuming that the Court were to nonetheless compare the original

complaint with the facts alleged in support of his fraudulent transfer claims, the

allegations underlying plaintiff's fraudulent transfer claims are, generally speaking, little

46

more than a bare recitation of the elements.  *See* Docket No. 1 at 23-26, ¶¶ 102-136.

Thus, it is difficult to determine whether the original complaint "fairly discloses the

general fact situation out of which the [fraudulent transfer] claims arise," *see In re*

*Universal*, 279 B.R. at 303, because the applicable facts are difficult to discern from the

complaint in the instant case.  For example, plaintiff alleges that the Computershare fee

transfers were "made while the debtor was insolvent," Docket No. 1 at 24, ¶ 108, but

there are no factual allegations supporting a plausible inference that IEAM was

insolvent between January 2005 and January 2008 when the fee transfers are alleged

to have taken place.  *See In re Sherman*, 18 F. App'x 718, 720 (10th Cir. 2001)

(unpublished) ("[t]he Bankruptcy Code defines insolvency as a financial condition such

that the sum of such entity's debts is greater than all of such entity's property, at fair

valuation, exclusive of exempt property and fraudulent transfers of a type not at issue

here" (quotation omitted)).  Moreover, plaintiff alleges that IEAM received less than

reasonably equivalent value for the fees it transferred to Computershare.  *See, e.g.*,

Docket No. 1 at 26, ¶ 135.  However, reasonable equivalence is determined "objectively

and from the perspective of the debtor's creditors, without regard to the subjective

needs or perspectives of the debtor or transferee."  *See In re Mercury Cos., Inc.*, 527

B.R. 438, 447 (D. Colo. 2015) (quotation omitted).  This determination generally

involves considering the totality of the circumstances, including the fair market value of

the benefit received, the existence of an arms-length relationship between debtor and

transferee, and a transferee's good faith.  *In re Fruehauf Trailer Corp.*, 444 F.3d 203,

213 (3d Cir. 2006).  The factual allegations in the instant complaint do not support a

plausible inference that IEAM did not receive reasonably equivalent value for the fees it paid Computershare under the relevant test.  Thus, because the instant complaint does not clearly set forth facts supporting plaintiff's fraudulent transfer claims, it is difficult to determine whether the original complaint provided Computershare with notice that it would have to mount a defense as to certain aspects of such claims.

The Court recognizes that, where allegations of fraud are involved, some courts favor a broad interpretation of the Rule 15(c) relation back standard.  *See In re Universal*, 279 B.R. at 307.  However, even when applying such an interpretation to the present case, plaintiff's conclusory and unsupported argument is insufficient to establish that his fraudulent transfer claims arose out of the same conduct, transaction, or occurrence set forth in the original complaint.  *See In re Bennett*, 275 B.R. at 452. Because plaintiff's sixth, seventh, eighth, and ninth claims for relief do not relate back to the original complaint pursuant to Fed. R. Civ. P. 15(c)(1)(B), he could not have asserted such claims in the Delaware adversary proceeding and such claims are barred by the statute of limitations in the present case.  Thus, plaintiff's sixth, seventh, eighth, and ninth claims are dismissed.

The Court turns to plaintiff's tenth claim for relief, which seeks to recover the fee transfers from Computershare pursuant to § 550(a).  To recover under § 550(a), a plaintiff must establish that a transfer has been avoided under, as relevant here, § 544 or § 548.  *See In re Jones Storage & Moving, Inc.*, 2005 WL 2590385, at *2 (Bankr. D. Kan. April 14, 2005) (setting forth elements of § 550 claim).  Because plaintiff's claims under § 544 and § 548 are barred by the applicable statute of limitations, plaintiff has failed to establish the requisite elements of a § 550 claim.  *See In re Sandoval*, 470

B.R. 195, 200 (Bankr. D.N.M. 2012) ("[§ 550] lists the rules that apply when a trustee is successful in avoiding, among other things, a preference").  Plaintiff's tenth claim for relief is therefore dismissed for failure to state a claim.[27]

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Computershare's Motion to Dismiss the Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) [Docket No. 56] is **GRANTED**.  It is further

**ORDERED** that this case is dismissed in its entirety.

DATED September 29, 2015.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge

---

[27]The Court does not reach Computershare's remaining arguments, including Computershare's argument that the Court should take judicial notice of certain press releases issued by IEAM.  *See* Docket No. 57 at 2.